## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

**BRUCE WAYNE EVERETT**                          **CIVIL ACTION**

**VERSUS**                                                    **NO. 07-5302**

**ATLANTIC SOUNDING CO., INC., ET AL.**          **SECTION "L" (2)**


## FINDINGS OF FACT & CONCLUSIONS OF LAW

## I. PROCEDURAL HISTORY

This case arises out of injuries allegedly sustained by Plaintiff Bruce Everett (the

"Plaintiff") on or about August 5, 2007, while he was employed as a member of the crew of the

E.W. ELLEFSEN.  At the time of the alleged incident, the E.W. ELLEFSEN was in port at a

repair facility located near Bourg, Louisiana.  The Plaintiff claims that he and his supervisor

were draining waste oil from a tank aboard the E.W. ELLEFSEN into a tank at the onshore

repair facility.  There was some additional waste oil remaining in the hose after the initial

transfer, however, because the tank at the repair facility was located at a higher elevation than

the tank aboard the E.W. ELLEFSEN.  In order to remove the leftover waste oil, the Plaintiff and

his supervisor agreed that the Plaintiff would carry the hose up to the third deck of the vessel,

which was located at a higher elevation than the onshore tank, so that the oil would simply drain

from the hose into the onshore tank without the need for any additional machinery.

The Plaintiff alleges that he was carrying the hose across the top deck when he slipped

and fell onto his back, severely injuring his tailbone and lower back.  According to the Plaintiff,

there was poor visibility on the top deck, the metal surface of the deck was slick with moisture

from a heavy fog, and there were several raised iron beams crossing the deck, making it difficult to carry a heavy load across the deck without tripping.

On August 31, 2007, the Plaintiff filed a complaint against Defendants Weeks Marine, Inc. ("Weeks Marine"), the owner of the E.W. ELLEFSEN, and Atlantic Sounding Co. ("Atlantic Sounding"), Weeks Marine's wholly owned subsidiary and the Plaintiff's employer at the time of the accident. The Plaintiff seeks damages under the Jones Act, 46 U.S.C. § 688, and the General Maritime Law for the Defendants' alleged negligence and vessel unseaworthiness. The Plaintiff also seeks damages for loss of earning capacity, as well as attorney's fees for the Defendant's alleged failure to timely pay his maintenance and cure benefits.

This matter came on for trial before the Court without a jury. After considering the testimony of the witnesses, the exhibits admitted into evidence, and the briefs submitted by the parties, the Court now makes the following Findings of Fact and Conclusions of Law pursuant to Rule 52 (a) of the Federal Rules of Civil Procedure. To the extent that a finding of fact constitutes a conclusion of law, the Court adopts it as such, and to the extent that a conclusion of law constitutes a finding of fact, the Court also adopts that as such.


## II. FINDINGS OF FACT

### 1.

In January 2007, the Plaintiff, Bruce Everett, began working for Bean Dredging as an oiler aboard the MERIDIAN, a dredge vessel. In April 2007, the MERIDIAN was purchased by Weeks Marine and renamed the E.W. ELLEFSEN.

2.

On April 25, 2007, Mr. Everett was hired as an oiler by Atlantic Sounding, Weeks Marine's wholly owned subsidiary, and he continued working aboard the E.W. ELLEFSEN.

3.

Prior to his employment with Atlantic Sounding, Mr. Everett worked for SeaRiver Maritime, Inc., from March 30, 1999, to January 14, 2003. During his employment with SeaRiver Maritime, Mr. Everett obtained his Tankerman (PIC) rating from the U.S. Coast Guard.

4.

From January 14, 2003, to January 21, 2004, Mr. Everett worked for Kirby Inland Marine, Inc., as a Tankerman II. Mr. Everett was discharged from Kirby Inland Marine after he tested positive for cocaine drug use during a random drug screening. Mr. Everett did not contest the results of the drug test.

5.

On February 12, 2006, Mr. Everett began work for Mike Hooks, Inc., a dredging company. When he applied for the job, Mr. Everett did not apply to work as a Tankerman. Instead, he applied only as a deckhand, or oiler. At trial, Mr. Everett explained that he had voluntarily allowed his Tankerman rating to expire. In order to renew it, he would have had to attend a drug abuse program and obtain a valid driver's license, because at that time he had a suspended license following an earlier DUI conviction. On December 26, 2006, Mr. Everett's employment with Mike Hooks ended after Mr. Everett sustained a work-related injury to his right knee.

6.

On April 27, 2007, Mr. Everett participated in a post-offer medical examination in connection with his employment with Atlantic Sounding. During the examination, Mr. Everett did not disclose to the examining physician that he was HIV positive or that he was taking various prescription drugs for his condition, including Kaletra, Combivir, and Coumadin.

7.

On the evening of August 5, 2007, the E.W. ELLEFSEN was in port at a Weeks Marine repair facility in Bourg, Louisiana. At approximately 6:00 p.m. that evening, Mr. Everett and Roy Smith, the supervising engineer on duty, began to pump the waste oil from a tank on the E.W. ELLEFSEN into an onshore tank located at the repair facility.

8.

Mr. Smith testified that he smelled alcohol on Mr. Everett that evening and asked to smell a beverage that Mr. Everett was holding. Mr. Smith stated that he could tell that the beverage was alcoholic from its strong odor. When asked why he did not immediately report Mr. Everett pursuant to company policy, Mr. Smith explained that Mr. Everett appeared to be "responsive" at the time and said that he would not do it again.

9.

The waste oil tank onboard the E.W. ELLEFSEN is located in the vessel's hold and was therefore lower in elevation than the tank at the onshore repair facility. As a result of the difference in elevation, there was still some slop oil remaining in the hose even after the initial transfer was complete. Mr. Smith testified that he had been instructed to remove as much of the remaining waste oil as possible because the company had scheduled maintenance operations the

next day to clean and inspect the waste oil tank.

10.

Mr. Smith and Mr. Everett discussed various options for removing the remaining waste oil. Mr. Smith ultimately chose to remove the remaining waste oil by having Mr. Everett carry the hose up to the third deck of the E.W. ELLEFSEN. Because the third deck was at a higher elevation than the tank at the repair facility, the oil would simply drain out of the hose and into the onshore tank without the need for any additional machinery.

11.

There were several other options available to Mr. Smith for removing the remaining waste oil from the E.W. ELLEFSEN's tank. For example, Mr. Smith could have chosen to use a vacuum truck to remove the leftover waste oil. A vacuum truck is a large truck with a vacuum tank that can be used to pump waste oil directly out of the tank. Edward Webster, an expert in the fields of marine engineering and safety, testified that using a vacuum truck is the safest and most efficient way of removing leftover waste oil from a tank such as the one located on the E.W. ELLEFSEN. Mr. Smith also testified that, in his opinion, using a vacuum truck would have been a safe and efficient way to remove the oil, and, in retrospect, he probably should have used a vacuum truck. Mr. Smith stated that he had successfully used vacuum trucks before but that this was the first time that he had attempted to drain oil from the hoses by having them carried up to the top deck.

12.

Mr. Smith also could have chosen to use pumps located on the vessel to remove the leftover oil, although this method would have left anywhere from one to six inches of slop oil

remaining in the tank.  The crew would have then had to go in and clean up the remaining oil using buckets and rags.  Another option for draining the tank would have been to pump the leftover oil into 55-gallon drums.  Another alternative would have been to wait until the following morning to use a crane to lift the hose up to the third deck and then position it to drain into the repair facility tank.  This method would have been much safer than having Mr. Everett carry the hoses up to the top deck, because each of the hoses is approximately 50 feet long and weighs about 150 pounds.  Together, the two hoses weigh approximately 300 pounds, plus the weight of the leftover waste oil.

13.

At approximately 4:30 a.m. on the morning of August 5, 2007, Mr. Everett carried one end of the hose up to the top deck of the E.W. ELLEFSEN.  Mr. Smith supervised the procedure from below and assisted by pushing the hose upward.  At that time, it was dark outside and there was no light directly illuminating the deck.  The metal surface of the deck was slick with moisture from a heavy fog, and the deck did not have any non-skid paint on it.  There are several raised iron beams crossing the deck, each one approximately 3 inches high and spaced about 24 inches apart, making it difficult to walk across the deck while carrying a heavy load without tripping.  Further, Mr. Everett was wearing steel-toed boots that were not ideal for navigating slick and slippery metal surfaces.

14.

When Mr. Everett reached the deck, he called down to inform Mr. Smith that there was some moisture on the deck's metal surface.  Mr. Smith instructed Mr. Everett to continue pulling the hose across the deck.  Despite Mr. Smith's orders, however, Mr. Everett testified that he

could have declined to carry the hoses across the deck if he had felt that the situation was unsafe. Mr. Everett further testified that, at the time, he did not feel that he was at risk of injury, and, had he felt that he was at risk, he would have stopped.

15.

As Mr. Everett was carrying the hose across the deck, he slipped and fell onto his tailbone. After he got up, he backed down the stairway and informed Mr. Smith that he had fallen and injured his tailbone.

16.

Approximately one hour after the accident, Mr. Everett was taken to the emergency room at the Terrebonne General Medical Center for treatment. An examination at the center revealed that Mr. Everett had suffered a moderate bruise to his tailbone. Mr. Everett was released from the medical center later that afternoon and was advised that he could return to work on August 8, 2007, after approximately three days of rest. At no time during the examination did Mr. Everett ever disclose to his treating physicians that he was HIV-positive or that he was taking several prescription medications for his condition, such as Kaletra, Combivir, and Coumadin.

17.

While he was receiving treatment at the Terrebonne General Medical Center, Mr. Everett took a drug and alcohol test, the results of which were negative.

18.

Weeks Marine and/or Atlantic Sounding paid for Mr. Everett's initial emergency room visit to Terrebonne General Medical Center. Neither Weeks Marine nor Atlantic Sounding paid any maintenance or cure beyond the cost of this initial emergency room visit.

19.

On the same day that Mr. Everett was receiving treatment at the Terrebonne General Medical Center, Mr. Smith discovered a half-empty bottle of Crown Royal whiskey stashed away with Mr. Everett's belongings. Mr. Smith reported his findings to Captain Mark Hebert and Chief Engineer Allen Van Der Velde, who in turn reported the incident to company administration. When Mr. Everett returned to work several days later, he was fired for violating a company policy prohibiting the possession of alcohol on company premises. Mr. Everett admitted that the alcohol belonged to him.

20.

After being released from Terrebonne General Medical Center, Mr. Everett did not pursue any additional medical treatment until August 20, 2007, nearly two weeks later, when he sought treatment from Dr. Ricco Impastato. After an initial physical examination of Mr. Everett, Dr. Impastato noted multiple areas of tenderness in the mid-back, all the way down to the hisacrum and coccyx, with significant muscle spasms, a restricted range of motion, and multiple positive orthopedic tests. Dr. Impastato recommended treatment with ice packs and muscle stimulation. Mr. Everett continued to see Dr. Impastato regularly, often up to three times per week.

21.

On August 29, 2007, Dr. Impastato used a pelvic block to balance out Mr. Everett's pelvis, did some distraction exercises on Mr. Everett's lower back and extremities, and continued to treat Mr. Everett's pain with a combination of ice and muscle stimulation.

22.

On September 7, 2007, Mr. Everett advised Dr. Impastato that he had been feeling better

until he had helped a friend carry sheetrock, which had increased his pain somewhat.

23.

On September 17, 2007, Mr. Everett reported that he felt somewhat sore as a result of riding on a lawn mower.

24.

On November 3, 2007, Dr. Impastato recommended that Mr. Everett's visits be reduced from three times per week to two times per week due to noticeable improvement in Mr. Everett's condition. On November 7, 2007, Dr. Impastato noted that Mr. Everett had started working in general carpentry and was doing well except for some mild soreness the following day. On November 16, 2007, Dr. Impastato performed a physical examination of Mr. Everett and noted that his condition had improved significantly from his initial examination.

25.

On December 12, 2007, Mr. Everett reported to Dr. Impastato that he had been doing carpentry work and tearing down a shed when a rotten board broke beneath his feet, causing him to fall from a 6' roof onto his shoulder. Following the accident, Dr. Impastato conducted an examination of Mr. Everett and found that, although Mr. Everett had suffered some minor cuts and scrapes, the accident had not exacerbated his previous spinal injury in any way.

26.

On January 11, 2008, Mr. Everett was discharged from Dr. Impastato's care due to reaching maximum medical improvement ("MMI") on his spine. In concluding that Mr. Everett had reached MMI, Dr. Impastato considered Mr. Everett's significant improvement from his initial visit as well as the fact that he was suffering from blood clots in his leg as a result of an unrelated condition. Although Dr. Impastato felt that Mr. Everett had reached MMI as far as the

services that he (Dr. Impastato) could provide, Dr. Impastato clarified that he did not feel that Mr. Everett was fully healed or ready to return to work. Dr. Impastato stated that he expected that Mr. Everett would continue to be treated by a specialist who could provide additional treatment, perhaps in pain management. Dr. Impastato further testified that, with appropriate additional treatment, Mr. Everett would likely be able to return to work in the future.

27.

In late January 2008, Mr. Everett was robbed and beaten by three men. There is no evidence that the incident exacerbated his previous injury in any way.

28.

On March 26, 2008, Mr. Everett sought treatment with Dr. Jorge Isaza. After conducting an initial physical examination, Dr. Isaza noted decreased range of motion in the cervical spine, lumbar area, and shoulders. In addition, Dr. Isaza reviewed x-rays and found a decrease at L4-5 and L5-S1, indicating a lumbar strain with a bulging disc at L4-5. Dr. Isaza prescribed Ultracet for pain and scheduled a follow-up visit. At the follow-up examination on May 2, 2008, Dr. Isaza reviewed Mr. Everett's MRI from after the accident and found evidence of a bulging disc at L4-5, with no central stenosis. In consideration of these findings, Dr. Isaza recommended that Mr. Everett seek treatment for pain management. Dr. Isaza testified that, in his opinion, Mr. Everett was unable to go back to work at that time. Mr. Everett had not, however, informed Dr. Isaza about any of the various work-related activities that he had been doing since the date of the accident.

29.

On June 30, 2008, Mr. Everett sought treatment from Dr. Allan Parr for pain management. On that date, Dr. Parr reviewed an MRI of Mr. Everett's lumbar spine dated

September 27, 2007, and found evidence of posterior bulging of intervertebral discs, partial thickness annular tear, and posterior bulging of the L4-5 intervertebral disc. Dr. Parr also noted a normal Patrick's test, normal straight leg raises with normal range of motion and no pain, crepitation, or contracture. In consideration of these findings, Dr. Parr diagnosed lumbar spondylosis and recommended medial branch blocks at L3-4, 4-5, and 5-1. A medial branch block is an injection into the branch of the nerve that comes out of the spine. In addition, Dr. Parr prescribed Lortab and Neurontin for pain. Dr. Also recommended that Mr. Everett begin wearing a back brace. Mr. Everett last saw Dr. Parr in October 2008, at which time Dr. Parr recommended that Mr. Everett undergo an additional six medial branch blocks per year for the next three years and participate in physical therapy, specifically aquatic therapy, with continued prescription medication for pain management. Mr. Everett had not, however, informed Dr. Parr of all the various work-related activities that he had been doing since the date of the accident.

30.

On September 29, 2008, Dr. Robert Appelbaum saw Mr. Everett in his office to conduct an independent medical examination. In preparation for the examination, Dr. Appelbaum reviewed reports and medical records from Terrebonne General Medical Center and Picayune Chiropractic, an MRI of Mr. Everett's lumbar spine dated September 27, 2007, and various surveillance videos from May 2008 to August 2008 showing Mr. Everett loading and unloading heavy items from the back of a pickup truck. Dr. Appelbaum performed a physical examination and noted moderate limitation of movement, but opined that Mr. Everett's limitation was at least partially voluntary. Dr. Appelbaum further noted the absence of any muscle spasms, as well as a lack of pain associated with a straight-leg test. At trial, Dr. Appelbaum testified that, in his opinion, Mr. Everett did not have any impairment or lasting damage involving nerve roots. Dr.

Appelbaum further stated that, in his opinion, Mr. Everett could return to work in any occupation, including heavy labor, without any restrictions, as the accident giving rise to this litigation had not caused any lasting damage at all to his lower back.

31.

Dr. Roger Berg also testified at trial. Prior to testifying, Dr. Berg had reviewed Mr. Everett's injury report, his hospital records, and the September 27, 2007 MRI report, though he had not examined Mr. Everett in person. After studying these medical records, Dr. Berg reported that the MRI film showed evidence of mild disc dessication, which, according to Dr. Berg, is a normal function of aging and is not necessarily indicative of trauma. Although Dr. Berg stated that massive trauma might accelerate such dessication, he also explained that a single instance of trauma, such as Mr. Everett's accident, would not likely accelerate the dessication. Dr. Berg did note a partial annulus defect in the MRI dated September 27, 2007, but he believed that the annulus damage had been present prior to the accident and did not appear on Mr. Everett's previous MRI due to poor image quality. Dr. Berg stated that the partial annulus defect did not compromise or displace any of the neurological tissues. Dr. Berg further testified that the September 27, 2007 MRI showed no evidence of any discernable injury to Mr. Everett's spinal column, discs, or nerve roots. According to Dr. Berg, Mr. Everett's spine is actually healthier than average for a man in his mid-forties, and his condition would not prevent him from returning to work in any capacity.

32.

On or about August 11, 2008, Mr. Everett sought medical treatment for an injury to his left wrist. Mr. Everett reported that he had been using a grinder to cut pieces of scrap metal when a metal fragment became lodged in his wrist. At trial, Mr. Everett testified that he could

not recall what kind of metal he was cutting, how long he had been cutting it, or for whom he was cutting it.

33.

In September 2008, Mr. Everett sought treatment with the Picayune Convenient Care medical facility for puffy eyes, poor sleep, and poor appetite. In connection with his visit, he reported that he had been doing carpentry work and demolishing a mobile home prior to seeking treatment.

34.

From the time of the accident giving rise to this litigation until trial, Mr. Everett engaged in light to heavy manual labor several times. Although Mr. Everett testified that he sometimes did jobs that he did not report on his income tax returns, the credible evidence shows that he did at least participate in the following activities: (1) on or about September 7, 2007, approximately one month after the accident, Mr. Everett helped a friend carry sheetrock; (2) on or about September 17, 2007, he used a riding lawnmower; (3) on or about November 7, 2007, he began doing general carpentry work; (4) on or about December 12, 2007, he was tearing down a shed when a rotten board broke beneath his feet and he fell from a 6' roof; (5) surveillance videos admitted into evidence show that from May 2008 to August 2008, he loaded and unloaded heavy objects from a pickup truck; (7) on or about August 11, 2008, he used a grinder to cut scrap metal; and (8) in September 2008, he assisted in demolishing a mobile home.

### III. CONCLUSIONS OF LAW

1.

The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1333, which provides

original jurisdiction over admiralty or maritime claims, and the Jones Act, 46 U.S.C. § 688.

2.

The matters before this Court include determinations as to whether the Defendants were negligent under the Jones Act, whether the vessel was unseaworthy under General Maritime Law, whether the Plaintiff is entitled to maintenance and cure benefits above what he has already received, whether the Plaintiff is entitled to damages for lack of earning capacity, and whether the Plaintiff is entitled to attorney's fees for the Defendants' failure to pay maintenance and cure.

3.

"To establish a claim for unseaworthiness, the injured seaman must prove that the owner has failed to provide a vessel, including her equipment and crew, which is reasonably fit and safe for the purposes for which it was intended to be used." *Boudreaux v. United States*, 280 F.3d 461, 468 (5th Cir. 2002) (quoting *Jackson v. OMI Corp.*, 245 F.3d 525, 527 (5th Cir. 2001)). "The standard is not perfection, but reasonable fitness; not a ship that will weather every conceivable storm, but a vessel reasonably suited for her intended service." *Boudoin v. Lykes Bros. S.S. Co.*, 348 U.S. 336, 339, 75 S.Ct. 382, 99 L.Ed. 354 (1955). "A vessel's condition of unseaworthiness might arise from any number of circumstances. Her gear might be defective, her appurtenances in disrepair, her crew unfit. The number of men assigned to perform a shipboard task might be insufficient. The method of loading her cargo, or the manner of its stowage, might be improper." *See Usner v. Luckenbach Overseas Corp.*, 400 U.S. 494, 499-500, 91 S.Ct. 514, 517-18, 27 L.Ed.2d 562 (1971) (internal citations omitted); *see also Webb v. Dresser Indus.*, 536 F.2d 603, 606 (5th Cir. 1976), *cert. denied*, 429 U.S. 1121, 97 S.Ct. 1157, 51 L.Ed.2d 572 (1977). A vessel is unseaworthy when an unsafe method of work is used to perform vessel services. *Rogers v. Eagle Offshore Drilling Serv.*, 764 F.2d 300, 303 (5th Cir. 1985);

*Burns v. Anchor-Wate Co.*, 469 F.2d 730 (5th Cir. 1972).  The duty of the vessel owner to provide a seaworthy vessel is an absolute non-delegable duty.

To recover damages from an unseaworthy condition, the plaintiff is required to establish a causal connection between his injury and the breach of duty that rendered the vessel unseaworthy.  *Gavagan v. United States*, 955 F.2d 1016, 1020 (5th Cir. 1992) (quoting *Johnson v. Offshore Exp., Inc.*, 845 F.2d 1347, 1354 (5th Cir. 1998)) ("To establish the requisite proximate cause in an unseaworthiness claim, a plaintiff must prove that the unseaworthy condition played a substantial part in bringing about or actually causing the injury and that the injury was either a direct result or a reasonably probable consequence of the unseaworthiness.").

The credible evidence supports a finding that the E.W. ELLEFSEN was unseaworthy because the Defendants used an unsafe method of work to perform vessel services, specifically carrying the hose up to and across the top deck of the vessel to drain the remaining waste oil. See *Rogers*, 764 F.2d at 303.  The crew began the procedure in the early morning hours, when the top deck was poorly lit.  At that time, the surface of the deck was slick with moisture from fog, and there was no non-skid paint on the deck to prevent slipping.  Several raised iron beams cross the deck, making it difficult to carry a heavy load across the deck without tripping.  When Mr. Everett reached the deck and called down to Mr. Smith to inform him that the deck was wet, Mr. Smith disregarded the warning and instructed Mr. Everett to continue carrying the hoses across the deck anyway.  There were several safer alternatives for removing the waste oil, including using a vacuum truck, using the vessel's own pumps, or using an onshore crane to assist in lifting the hoses.  Further, it is clear that the unsafe procedure was the proximate cause of Mr. Everett's injury because he was injured in the process of carrying the hose across the vessel's slippery deck.

4.

"A seaman is entitled to recovery under the Jones Act ... if his employer's negligence is the cause, in whole or in part, of his injury."  *Gautreaux v. Scurlock Marine, Inc.*, 107 F.3d 331, 335 (5th Cir. 1997).  An employer has the duty to provide his seaman employees with a reasonably safe place to work, including providing reasonably suitable gear.  *Colburn v. Bunge Towing, Inc.*, 883 F.2d 372, 374 (5th Cir. 1989).  A cause of action under the Jones Act arises when this duty is breached and the employer's breach is the legal cause of the seaman's injury.  *Gavagan*, 955 F.2d at 1019-20.

5.

In this case, the credible evidence supports the conclusion that the Defendants were negligent in using an unsafe work procedure and in failing to provide Mr. Everett with a reasonably safe place to work.  At the time of the accident, the top deck of the vessel–with poor lighting, a slick metal surface, and numerous raised iron beams–was not a reasonably safe place to conduct the fuel transfer procedure.  The credible evidence further supports the conclusion that the Defendants' negligence was the direct and proximate cause of Mr. Everett's injury, because he slipped and fell while he was attempting to carry the hose across the deck.

6.

A seaman has a duty under the Jones Act and General Maritime Law to act as an ordinarily prudent seaman would act in the same or similar circumstances.  *Jackson*, 245 F.3d at 528.  As a result, a seaman's comparative negligence may apply to decrease the amount of his recovery on a Jones Act claim for negligence.  *Jauch v. Nautical Servs., Inc.*, 470 F.3d 207, 213 (5th Cir. 2006).  "A seaman's contributory negligence will not bar his recovery, but may reduce the amount of damages owed proportionate to his share of fault."  *Id.*  "The standard of care for a

seaman under the Jones Act is to act as an ordinarily prudent seaman would act in similar circumstances. *Jackson*, 245 F.3d at 528; *Gautreaux*, 107 F.3d at 338-39.

7.

In this case, the credible evidence supports the conclusion that the Plaintiff was negligent and that his comparative negligence contributed to the events leading up to his injury. When Mr. Everett reached the top deck, he was in the best position to judge the safety of the procedure from that point forward. Mr. Everett is an experienced seaman, having worked in the industry for several years and having once reached the level of Tankerman. Mr. Everett was aware of the dangers of carrying the hose across the deck, as he was the one who called down to Mr. Smith to inform him that the deck was wet. Although Mr. Smith instructed Mr. Everett to go ahead and carry the hose across the deck anyway, Mr. Everett testified that he could have stopped at anytime if he felt that he was at risk of injuring himself. Mr. Everett knew that the deck was wet and that he would have to step over the raised iron beams, but he nevertheless chose to carry the hose across the deck anyway, putting himself directly at risk of injury. Further, there is evidence that Mr. Everett's steel-toed boots were not appropriate footwear to conduct the procedure in those conditions. Accordingly, the Court apportions liability for the accident as follows: the Plaintiff is 20% liable, and the Defendants are 80% liable.

8.

Damages for pain and suffering may be awarded to a seaman who is injured, in whole or in part, due to his employer's negligence or the unseaworthiness of the vessel. *Sosa v. M/V Lago Izabal*, 736 F.2d 1028, 1034 (5th Cir. 1984). The credible evidence supports the conclusions that the Plaintiff has suffered past physical pain due to his injury but is not likely to suffer additional discomfort in the future, at least from the incident which is the subject of this lawsuit. Any

future pain and suffering or disability is due to non-related injuries or conditions. The Court finds that the Plaintiff is entitled to an award of $50,000 for past pain and suffering. Due to his comparative negligence, the Plaintiff is entitled to recover 80% of these damages. The Plaintiff is not entitled to damages for future pain and suffering.

9.

A seaman injured in the course of his or her employment has a claim for maintenance and cure. Maintenance and cure is the implied right of the seaman arising from his or her employment relationship with the shipowner and is "independent of any other source of recovery for the seaman (e.g., recovery for Jones Act claims)." *Bertram v. Freeport McMoran, Inc.*, 35 F.3d 1008, 1013 (5th Cir. 1994). Thus, whether the seaman or employer was negligent is not at issue. *Brister v. AWI, Inc.*, 946 F.2d 350, 360 (5th Cir. 1991). Maintenance is the seaman's right to food and lodging, whereas cure is the seaman's right to necessary and appropriate medical services, and both rights extend to the point at which the seaman reaches maximum medical improvement (MMI). *Breese v. AWI, Inc.*, 823 F.2d 100, 104 (5th Cir. 1987) (citing *Vaughan v. Atkinson*, 369 U.S. 527, 531, 82 S.Ct. 997, 8 L.Ed.2d 88 (1962)). Therefore, the maintenance and cure duty does not extend to treatment which is only palliative in nature and "results in no betterment in the claimant's condition." *Rashidi v. Am. President Lines*, 96 F.3d 124, 128 (5th Cir. 1996).

10.

The seaman's claim for maintenance and cure lies against the seaman's employer. *Caulfield v. AC & D Marine, Inc.*, 633 F.2d 1129, 1131 (5th Cir. Unit A 1981). In order to recover maintenance, the seaman plaintiff must produce "evidence to the court that is sufficient to provide an evidentiary basis for the court to estimate his actual costs." *Hall v. Noble Drilling*

*(U.S.), Inc.*, 242 F.3d 582, 590 (5th Cir. 2001). Provided he has incurred the expense, the seaman is entitled to the reasonable cost of food and lodging. *Id.* at 587. "A seaman's burden of production in establishing the value of maintenance is feather light: his own testimony as to reasonable cost of room and board in the community where he is living is sufficient to support an award." *Yelverton v. Mobile Laboratories, Inc.*, 782 F.2d 555, 558 (5th Cir. 1986). Lodging encompasses those expenses "necessary to the provision of habitable housing," including heat, electricity, home insurance, and real estate taxes. *Hall*, 242 F.3d at 587 n. 17. Maintenance payments continue until a seaman reaches maximum cure, which is defined as the point at which further treatment will not result in a betterment of the seaman's condition. *See Springborn v. Am. Commercial Barge Line, Inc.*, 767 F.2d 89, 95 (5th Cir. 1985).

The credible evidence supports a finding that the Plaintiff is entitled to benefits for maintenance and cure. The credible evidence further supports the conclusion that the Plaintiff reached maximum cure on November 7, 2007, when he began performing general carpentry work. This finding is consistent with the opinions of Dr. Appelbaum and Dr. Berg, both of whom testified that the Plaintiff was capable of returning to work and had suffered little, if any, significant lasting damage from the accident. This finding is also consistent with the fact that, in December 2007, the Plaintiff was not only able to do work demolishing a shed, but could even walk across rotten roof beams in order to complete the project. The Plaintiff testified that he has been living with his mother since shortly after the accident and has been contributing approximately $200 per month to the household bills and rent, in addition to several other personal expenses. Accordingly, the Court finds that the Plaintiff is entitled to recover maintenance benefits in the amount of $20 per day from August 5, 2007, to November 7, 2007.

With respect to the Plaintiff's benefits for cure, the Defendants paid for the Plaintiff's initial emergency room visit to Terrebonne General Medical Center but did not pay for any additional medical treatment beyond that point. The Plaintiff seeks payment of $38,029.07 for past medical expenses. The Plaintiff also seeks payment of expenses for future medical treatment, including additional physical therapy, prescription medicine, pain management, and any other appropriate treatment. The credible evidence is clear that the Plaintiff is not a surgery candidate and that he would not benefit from surgery. As stated above, the credible evidence also supports the conclusion that the Plaintiff reached maximum cure on November 7, 2007. Any additional medical treatment the Plaintiff received after November 7, 2007, was either palliative in nature or was due to non-related injuries or conditions. After reviewing the evidence and the witness testimony, the Court finds that an award of $6,796.75 for past medical expenses is appropriate. This sum represents the Plaintiff's total past medical expenses beginning August 5, 2007, through November 7, 2007, with credit for the cost of the Plaintiff's initial emergency room treatment, which was paid for by the Defendants. *See* Exhibit 36. The Plaintiff is not entitled to additional damages for future medical expenses.

12.

A seaman's willful concealment of a pre-existing physical disability may lead to a denial of maintenance and cure benefits. *See McCorpen v. Cent. Gulf Steamship*, 396 F.2d 547 (5th Cir. 1968). This is because a shipowner's obligation to provide maintenance and cure, though deep-rooted in general maritime law, is "an incident or implied term of a contract for maritime employment." *Id.* at 548. In order for a shipowner to rely on the legal defense to deny the seaman's maintenance and cure claim, known as the *McCorpen* defense, the employer must

establish: (1) the claimant intentionally misrepresented or concealed medical facts; (2) the nondisclosed facts were material to the employer's decision to hire the claimant; and (3) a connection exists between the withheld information and the injury complained of in the lawsuit. *Brown*, 410 F.3d at 171 (citing *McCorpen*, 396 F.2d at 548-49).

In this case, the Defendants seek to invoke a modified form of the *McCorpen* defense because they contend that they never would have hired Mr. Everett as an oiler if they had known about his HIV-positive condition. According to the Defendants, if they had never hired Mr. Everett as an oiler, he never would have been injured. The Plaintiff argues that the Defendants are seeking an unprecedented expansion to the *McCorpen* defense, as there is no nexus, or causal link, between his HIV-positive condition and the injury that he sustained to his lower back.

Although Mr. Everett failed to disclose his HIV-positive condition or prescription medications to his employer, there is no evidence that either his medical condition or his failure to disclose the condition were in any way related to his injury. There is simply no relation between the Plaintiff's HIV-positive condition or the medications he was taking and the injury that he sustained when he slipped and fell during the unsafe fuel transfer procedure. The Defendants are essentially seeking to expand the *McCorpen* defense to do away with the requirement of a nexus, or causal link, between the plaintiff's non-disclosed injury and the injury giving rise to his request for maintenance and cure. Such an expansion is flatly inconsistent with the overwhelming weight of jurisprudence. *See McCorpen*, 396 F.2d at 549 (citing *Hazelton v. Luckenbach Steamship Co.*, 134 F. Supp. 525 (D. Mass. 1955) (requiring nexus, or causal link, between the seaman's undisclosed, pre-existing disability and the injury that he incurred during his performance of vessel services)). The Defendants' argument is therefore without merit.

13.

If a seaman's employer willfully fails to pay the seaman's rightful maintenance and cure benefits, the seaman may recover attorney's fees. *Brown v. Parker Drilling Offshore Corp.*, 410 F.3d 166, 177 (5th Cir. 2005); *Guevara v. Maritime Overseas Corp.*, 59 F.3d 1496, 1513 (5th Cir. 1995). In order to recover attorney's fees for the defendant's willful failure to pay these benefits, the plaintiff bears the burden of proving that: (1) he was injured in the course of his employment aboard the vessel; (2) the defendants failed to pay maintenance and cure; and (3) the defendants' failure to pay these benefits was both willful and arbitrary. *Guevara*, 59 F.3d at 13.

In this case, the Defendants based their decision not to pay maintenance and cure benefits on the medical evaluation they received from Terrebonne General Medical Center, which advised that Mr. Everett would be able to return to work in three days. Indeed, Mr. Everett did in fact return to work as scheduled, but he was fired for violating a company policy prohibiting the possession of alcohol on company premises. Thomas Langan, the Defendants' corporate representative, testified that, given the results of the emergency room examination, the Defendants believed that Dr. Isaza was treating a condition that was not related to the injury giving rise to this litigation. In addition, Mr. Langan testified that the Defendants believed that the Plaintiff's treatment appeared to be only palliative in nature, as surveillance videos revealed that the Plaintiff was continuing to engage in manual labor during the period of his treatment. After reviewing all of the evidence and the witness testimony, the Court finds that the Defendants' actions do not rise to the level of willful callousness or "egregious fault" required for them to be considered liable for attorney's fees. *See Guevara*, 59 F.3d at 1513.

14.

A seaman claiming to have sustained personal injury may be entitled to recover past and

future economic losses.  *Culver v. Slater Boat Co.*, 722 F.2d 114, 122 (5th Cir. 1983).  Past economic losses are generally determined by the actual wage loss incurred by the plaintiff to the date of trial.  *Williams v. Reading & Bates Drilling Co.*, 750 F.2d 487 (5th Cir. 1985).  Future economic losses include loss of earning capacity and fringe benefits.  When determining future economic losses, the court must consider whether the plaintiff will be totally or partially disabled so that his future earnings will actually be diminished.  *Johnson v. Offshore Express, Inc.*, 845 F.2d 1347, 1357 (5th Cir. 1988).

In the instant case, the Plaintiff seeks damages for loss of future wages and/or earning capacity because he claims that he is permanently disabled and will be unable to return to his former profession.  The Plaintiff also claims that, if it were not for his injury, he would have eventually renewed his Tankerman rating and would have also received a promotion, significantly increasing his earning capacity.  Stephanie Chalfin, a vocational rehabilitation counselor for the Plaintiff, testified that the Plaintiff would be unable to return to his previous occupation as an oiler and that he would suffer a loss of earning capacity if he were to perform any alternative light-duty or sedentary work.  According to Ms. Chalfin, the Plaintiff likely would have taken all of the necessary steps to renew his Tankerman rating, and, given his previous favorable work evaluations, he likely would have been promoted to a higher-paying position.

The Defendants dispute that the Plaintiff has suffered any loss of earning capacity.  Dr. Berg testified that, in his opinion, the Plaintiff had not suffered any long-term injury and should be able to return to any kind of work without restrictions.  Nancy Favaloro, a vocational rehabilitation counselor, testified that Mr. Everett could also choose to pursue various jobs involving light-duty work and could earn essentially the same amount that he was making prior

to his injury.  Ms. Favaloro also indicated that the Plaintiff's work history reflected a pattern of

not progressing very far in any one career path.  Ms. Favaloro further testified that, in her

opinion, there was no evidence that Mr. Everett intended to renew his Tankerman rating, as he

had been working as an oiler for several years without ever attempting to renew it previously.

The credible evidence supports the conclusion that the Plaintiff is capable of returning to

work in his previous occupation without restrictions.  Accordingly, the Plaintiff is not entitled to

recover damages for loss of future wages or loss of earning capacity.


## IV. PRE-JUDGMENT INTEREST

Pre-judgment interest may be awarded in admiralty cases if appropriate.  In the instant

case, the Court finds that an award of pre-judgment interest is appropriate.  "Prejudgment

interest is compensation allowed by law as additional damages for lost use of the money due as

damages during the lapse of time between the accrual of the claim and the date of judgment."

*Jauch*, 470 F.3d at 214-15.  Pre-judgment interest is not available on future damages.  *Id.*  The

starting date and rate of interest is left to the sound discretion of the court.  *See Doucet v.

Wheless Drilling Co.*, 467 F.2d 336, 340 (5th Cir. 1972).  The Court finds that an award of

prejudgment interest at the rate of 5.5% per annum is warranted on the Plaintiff's past damages.


## V. SUMMARY

On the basis of the above Findings of Fact and Conclusions of Law, the Court finds that

the Plaintiff, Bruce Everett, sustained damages due in part to the Defendants' negligence and in

part to the Plaintiff's negligence.  The Plaintiff is entitled to payment for maintenance and cure.

The Defendants are not, however, liable for attorneys' fees for willful or arbitrary denial of

maintenance and cure.  As stated above, the Plaintiff is entitled to recover 80% of the following damages:

(1) Past medical expenses: $6,796.75;

(2) Past pain and suffering: $50,000.00; and

(3) Maintenance: $20 per day from August 5, 2007, to November 7, 2007.

Additionally, the Plaintiff is entitled to pre-judgment interest on the above-mentioned past losses at the rate of 5.5% per annum from the date of judicial demand until satisfied.

New Orleans, Louisiana, this 12th day of June, 2009.

_____
UNITED STATES DISTRICT JUDGE